## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **NORTHWESTERN MEMORIAL HEALTHCARE,** | ) | **COMPLAINT AT LAW** |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **1:26-cv-05050** |
| **v.** | ) | |
| | ) | |
| **FREEDOM LIFE INSURANCE COMPANY** | ) | **JURY TRIAL DEMANDED** |
| **OF AMERICA; DOES 1-25 inclusive,** | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

### PLAINTIFF NORTHWESTERN MEMORIAL HEALTHCARE'S
### FIRST AMENDED COMPLAINT AT LAW

1.    Plaintiff, NORTHWESTERN MEMORIAL HEALTHCARE (hereinafter "NORTHWESTERN"), by and through its attorneys, LAW OFFICES OF STEPHENSON, ACQUISTO & COLMAN, for its First Amended Complaint at Law ("Complaint") against FREEDOM LIFE INSURANCE COMPNAY OF AMERICA, a subsidiary of USHealth Group, Inc., a UnitedHealthcare Company (hereinafter "FREEDOM LIFE"), and DOES 1 THROUGH 25, INCLUSIVE, upon personal information as to their own activities and upon information and belief as to the activities of others and all other matters, and states as follows:

### INTRODUCTION

2.    This is an action against FREEDOM LIFE for breach of implied-in-fact contract and *quantum meruit* arising from a business relationship between NORTHWESTERN and FREEDOM LIFE. By this action, NORTHWESTERN seeks compensatory damages, interest, and costs.

**37287 - NMHC v FREEDOM LIFE**          1          **COMPLAINT AT LAW**

## PARTIES

3.      Plaintiff Northwestern Memorial Healthcare is a non-profit public benefit corporation organized and existing pursuant to the laws of the State of Illinois. NORTHWESTERN and its subsidiary including, but not limited to Lake Forest Hospital, provided medical care to Patient (as such term is defined herein), including the Patient at issue herein, who was a FREEDOM LIFE beneficiary when such medical care was provided. NORTHWESTERN has its principal place of business in the City of Chicago, County of Cook, State of Illinois.

4.      FREEDOM LIFE  is a fully integrated insurance holding company based in Fort Worth Texas, and headquartered at 300 Burnett Street, Fort Worth, Texas.

5.      NORTHWESTERN is unaware of the true names and capacities, whether corporate, associate, individual, partnership or otherwise of defendants DOES 1 through 25, inclusive, and therefore sues such defendants by such fictitious names. NORTHWESTERN will seek leave of the Court to amend this Complaint to allege its true names and capacities when ascertained.

6.      FREEDOM LIFE and Does 1 through 25, inclusive, shall be collectively referred to as "FREEDOM LIFE" or "Defendants."

7.      Defendants, each of them, at all relevant times, have transacted business in the State of Illinois. The violations alleged within this Complaint have been and are being carried out in the State of Illinois.

8.      NORTHWESTERN is informed, believes and thereon alleges that at all relevant times each of the Defendants, including the defendants named "Doe," was and is the agent, employee, employer, joint venturer, representative, alter ego, subsidiary and/or partner of one or more of the other defendants, and was, in performing the acts complained of herein, acting within

the scope of such agency, employment, joint venture, or partnership authority, and/or is in some other way responsible for the acts of one or more of the other defendants.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209(a) and (b) because, upon information and belief, Defendant transacts business within Illinois, contracts to insure Illinois residents and risks located in Illinois, and commits acts within Illinois giving rise to the claims asserted herein. See 735 ILCS 5/2-209(a)(1) (2), (4); 735 ILCS 5/2-209(b)(4).

10. The exercise of personal jurisdiction over Defendant further comports with due process in that Defendant has purposefully availed itself of the privilege of conducting business in Illinois, including marketing, underwriting, issuing, and/or administering insurance policies to Illinois residents and handling claims in Illinois, and Plaintiff's claims arise out of or relate to those Illinois contacts. See 735 ILCS 5/2-209(c).

11. Subject matter jurisdiction is proper in the Circuit Court of Cook County, Illinois, as a court of general jurisdiction over civil actions. See Ill. Const. art. VI, § 9.

12. Venue is proper in Cook County under 735 ILCS 5/2-101 because, upon information and belief, Defendant is doing business in Cook County and/or the transactions and events giving rise to the claims occurred, in whole or in part, in Cook County. See 735 ILCS 5/2-101; 735 ILCS 5/2-102(a).

13. To the extent Defendant is not a resident of Illinois, venue is nevertheless proper in Cook County because Defendant is a nonresident that is doing business in this county and is joined in this action with Illinois-resident parties for whom venue is proper in Cook County. See 735 ILCS 5/2-101; 735 ILCS 5/2-102(a), (b).

14.     Additionally, to the extent this action concerns an insurance obligation covering persons, property, or risks located in Cook County, venue is proper where the insured resides or where the insured risk is located. See 735 ILCS 5/2-103(e).

## FACTUAL BACKGROUND

15.     NORTHWESTERN, between the dates of December 13, 2021 through January 22, 2022, provided medically necessary treatment to the individual identified on the spreadsheet attached as Exhibit A[1] to this Complaint (and which is incorporated herein by this reference as though set forth in full) (the "Patient") totaling one (1) claim. On the dates of service set forth in Ex. A ("the Dates of Service"), NORTHWESTERN rendered medically necessary services, supplies and/or equipment to Patients until Patients became stable for discharge from NORTHWESTERN.

16.     NORTHWESTERN is informed and believes and thereon alleges that at all relevant times Patient was an enrollee and/or beneficiary of health plans sponsored, financed, administered, and/or funded by FREEDOM LIFE.

17.     NORTHWESTERN is informed, believes and thereon alleges FREEDOM LIFE is financially responsible for the medically necessary services, supplies, and/or equipment (including, but not limited to, emergency care) rendered to the Patient on the Dates of Service.

18.     Prior to and during the dates of service set forth in Ex. A, NORTHWESTERN sought authorization for treatment from FREEDOM LIFE. FREEDOM LIFE gave authorization reference numbers, represented that authorization was pending, and/or requested supporting clinical medical records which NORTHWESTERN provided.

---

[1] NORTHWESTERN has limited disclosure of patient identification here pursuant to the privacy provisions of the Health Insurance Portability & Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320 et seq. A more detailed Exhibit can be provided upon entry of a Court Ordered, HIPAA compliant protective order.

**37287 - NMHC v FREEDOM LIFE**                    4                    **COMPLAINT AT LAW**

19.     Insurance companies like FREEDOM LIFE receive millions of dollars in premiums collected from their clients and insureds in exchange for the promise of making benefit payments to healthcare providers for emergency and other medical services rendered to their members.

20.     FREEDOM LIFE received premium payments for Patient's enrollment and coverage in FREEDOM LIFE's respective health plans.

21.     FREEDOM LIFE accepted the services NORTHWESTERN provided to Patient as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

22.     NORTHWESTERN's usual and customary charges for the medically necessary services, supplies and/or equipment rendered to Patients amounted to $788,225.25.

23.     NORTHWESTERN timely and properly submitted the bills containing said charges for the medically necessary services, supplies, and/or equipment rendered to Patient to FREEDOM LIFE for payment.

24.     Rather than properly and fully pay NORTHWESTERN for the medically necessary services, supplies, and/or equipment NORTHWESTERN rendered to the Patients, FREEDOM LIFE underpaid, issuing payments of $41,605.10. To date, FREEDOM LIFE owes NORTHWESTERN no less than $589,182.00. Ex. A.

25.     FREEDOM LIFE failed to pay fully and properly NORTHWESTERN for the medically necessary services, supplies, and/or equipment rendered to Patient, despite demands thereof.

26.     FREEDOM LIFE has refused, despite NORTHWESTERN's repeated demands, to fully and properly pay NORTHWESTERN the reasonable and customary value of the medical care rendered to FREEDOM LIFE's beneficiary as specified in Ex. A. FREEDOM LIFE has

unjustly benefitted by not paying fully NORTHWESTERN for the reasonable value of such services.

27.     FREEDOM LIFE unjustly benefitted by not paying fully NORTHWESTERN for the reasonable value of such services. FREEDOM LIFE promised its beneficiaries (including Patient) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patients' premiums, collected such premiums and then refused, despite demands, to fully and properly pay NORTHWESTERN the reasonable and customary value of the medical care rendered to FREEDOM LIFE's beneficiaries as specified in Ex. A. FREEDOM LIFE accepted the services NORTHWESTERN provided to Patient as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

28.     FREEDOM LIFE further unjustly and directly benefited at NORTHWESTER's expense, when it caused NORTHWESTERN to treat its beneficiary, Patient, in the following ways:

a)  Improved Health Outcomes – FREEDOM LIFE has a vested interest in keeping their enrollees, like Patient, healthy, as healthier individuals require less medical care and incur fewer costs. By encouraging their enrollees, like Patient, to seek medical care when needed, including hospitalization, when necessary.

b)  Better Customer satisfaction – when Patient received quality care at NORTHWESTERN, Patient was more satisfied with their health insurance coverage which would have led to increased loyalty and retention rates for FREEDOM LIFE.

c)  Increased Market Share – by offering competitive coverage that includes access to high-quality hospitals, like NORTHWESTERN, FREEDOM LIFE was able to attract new

customers and retain existing ones. This helped them gain a larger share of the market which led to increased profits and better bargaining power with healthcare providers.

d) Cost Savings – FREEDOM LIFE saves money by avoiding further future costly treatments and is therefore able to keep premiums lower for their customers, further increasing FREEDOM LIFE's attractiveness and competitiveness in expanding its patient-pool.

29. As a direct and proximate result of FREEDOM LIFE's wrongful conduct, NORTHWESTERN has suffered damages in an amount to be proven at trial but not less than the sum of $589,182.00 exclusive of interest.

### *Importance of Insurance Cards*

30. FREEDOM LIFE accepted the services NORTHWESTERN provided to Patients as demonstrated by acts including but not exclusive to issuing insurance cards, authorizations and collection of premiums.

31. Prior to the Dates of Service, FREEDOM LIFE issued identification cards to Patient. Those identifications cards contained the following including but not limited to:

a) Instructions of where and how to bill FREEDOM LIFE for the services provided;

b) Information on how to contact FREEDOM LIFE to verify eligibility and benefits;

c) Contact information to submit electronic and/or paper claims for billing.

32. FREEDOM LIFE instructed Patient to present these identifications cards to the provider; in this case, NORTHWESTERN.

33. FREEDOM LIFE informed under the Prudent Layperson Standard which established that emergency room visits would be covered and paid for by FREEDOM LIFE if a reasonable person would think it's an emergency. *See* 42 U.S.C. §675.

34. NORTHWESTERN knew, was aware of, and understood this industry custom and

practice including that an insurer, like FREEDOM LIFE, could not and would not refuse coverage for a valid emergency under the Prudent Layperson Standard.

35. FREEDOM LIFE knew, was aware of, and understood that NORTHWESTERN must provide care that is required under EMTALA, specifically the following;

a) Medical Screening Examination (MSE) whereby NORTHWESTERN must provide an appropriate medical screening to any person who comes to the emergency room and requests examination or treatment for a medical condition to determine whether an emergency medical condition (EMC) exists. The MSE must be performed without delay and regard to ability to pay or insurance status. The screening must be the same standard given to any patient with similar symptoms.

b) Stabilization Requirement - If an EMC is found, NORTHWESTERN must provide necessary treatment to stabilize the patient. Stabilization means no material deterioration is likely during transfer/ discharge.

c) Appropriate Transfer - If NORTHWESTERN cannot stabilize the patient it may transfer to another facility only if:

i) The receiving facility has capacity and agrees to accept the patient; and

ii) The transfer is medically appropriate

d) Transfers require written physician certification that benefits outweigh the risks

36. FREEDOM LIFE thus anticipated that NORTHWESTERN would submit a claim to FREEDOM LIFE that FREEDOM LIFE is legally obligated to review and often pay NORTHWESTERN.

### *Meeting of the Minds Through Communication and Billing*

37. During the Dates of Service alleged in Ex. A, NORTHWESTERN and FREEDOM

LIFE engaged in real-time communications during the stay, including but not limited to the following:

a) Pre-Authorization for Certain Services: While most emergency care cannot require prior authorization, once the Patients were stabilized, further care (admissions, surgeries, transfers) may require insurer approval;

b) Case Management Calls: FREEDOM LIFE contacted NORTHWESTERNS's case manager to discuss discharge planning or preferred follow-up care;

38. This is a mini-agreement within the larger framework of providing the care for the patient.

### Electronic Claim & Payment Systems

### (Functional Operational Agreement Through Industry Custom and Practice and Standard Billing Practices)

39. NORTHWESTERN submitted the claims electronically and physically in FREEDOM LIFE's required format. This use of the FREEDOM LIFE's claim submission process, including but not limited to online portals, and adherence of FREEDOM LIFE's claim billing rules is itself part of an ongoing "meeting of the minds" about how healthcare business is done.

40. The implied operational agreement between NORTHWESTERN and FREEDOM LIFE in the ER setting is a tacit but real "meeting of the minds" because both sides — by their conduct — demonstrate mutual understanding and acceptance of how claims will be handled after the care is delivered.

41. Even before the Patient arrived at NORTHWESTERN, both NORTHWESTERN and FREEDOM LIFE operated within an established administrative framework that governed the following billing practices:

      i)      Claim format (electronic data interchange standards like ANSI X12 837)

      ii)     Coding requirements (ICD-10, CPT, HCPCS)

      iii)    Supporting documentation (ER notes, test results, operative reports)

      iv)    Payment remittance format (ANSI 835 EDI or equivalent)

      v)     Appeal procedures if the claim is denied

42. Both parties knew these operational rules and intended to follow them when NORTHWESTERN delivered care and later sought payment.

### *Mutual Consideration*

43. NORTHWESTERN's consideration: NORTHWESTERN agreed to submit the claims in FREEDOM LIFE's required format, follow the coding guidelines, and abide by FREEDOM LIFE's claim review process.

44. FREEDOM LIFE's consideration: FREEDOM LIFE agreed to process the claims in good faith according to those same operational rules and remit payment (or issue a lawful denial) within the agreed or legally required timeframe.

45. NORTHWESTERN, by treating the Patient and later submitting a claim in FREEDOM LIFE's prescribed way, essentially offered to exchange compliance with the rules for payment.

46. FREEDOM LIFE, by processing the claims in that format rather than rejecting it outright for noncompliance, accepts that operational arrangement.

47. Both parties knew what the billing rules were and acted as though they were bound by them.

48. NORTHWESTERN performed by sending the claims; FREEDOM LIFE performed by adjudicating and paying (or denying) the claims.

49.     NORTHWESTERN and FREEDOM LIFE followed the same operational "rulebook," which was never separately negotiated for these Patients but is universally understood between them.

50.     The meeting of the minds occurred because both Parties, without explicit negotiation at the moment, choose to operate within that same established administrative system with mutual expectations of performance and payment.

### *Industry Custom & Prior History*

51.     Prior to the Dates of Service, a pattern of behavior had developed that was almost automatic between FREEDOM LIFE and NORTHWESTERN:

   a)  NORTHWESTERN's registration staff collected insurance details on intake;

   b)  NORTHWESTERN sent an admission notification or real-time eligibility check to the FREEDOM LIFE; and,

   c)  FREEDOM LIFE sent back a verification of coverage.

52.     Also, upon the issuance of verification of coverage, hospital staff requested authorization for treatment, and FREEDOM LIFE either gave an authorization number, requested medical records, or indicated that authorization was not needed for the treatment (as indicated on the insurance cards FREEDOM LIFE created and provided for Patients).

53.     By continuing treatment with this knowledge, both parties acted under an implied understanding of payment and care responsibilities.

54.     FREEDOM LIFE, though indicating that Patients had verified benefits and coverage, understood that if coverage was established for a patient's treatment, under the industry custom and practice, NORTHWESTERN understood that a confirmation of coverage meant that those services would be paid by FREEDOM LIFE.

55. The reason for why NORTHWESTERN interpreted the verification of benefit and establishment of a service as "covered", is that 1) FREEDOM LIFE only gave out authorization numbers or indicated authorization was not needed when FREEDOM LIFE knew what services were being provided and 2) FREEDOM LIFE gave authorizations or indicated none was needed with the intent to induce NORTHWESTERN to provide services to the FREEDOM LIFE' members.

56. In addition, prior course of conduct by FREEDOM LIFE included NORTHWESTERN submitting claims to NORTHWESTERN and in response, FREEDOM LIFE would properly pay the usual and customary value of those claims. From January 1, 2020 to December 31, 2025, NORTHWESTERN has billed numerous claims and FREEDOM LIFE has satisfactorily paid on a number of claims submitted by NORTHWESTERN in the near identical manner and method as the facts alleged herein.

57. FREEDOM LIFE knew that NORTHWESTERN would not provide services to the FREEDOM LIFE's members gratuitously.

58. FREEDOM LIFE's provisions of authorization or assurance that authorization was not required was done so only after it had determined that FREEDOM LIFE would assume responsibility for the reimbursement of the claims.

59. FREEDOM LIFE promised its beneficiaries (including Patient) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patients' premiums and collected such premiums.

60. FREEDOM LIFE has refused, despite NORTHWESTERN's repeated demands, to fully and properly pay NORTHWESTERN the reasonable and customary value of the medical care rendered to FREEDOM LIFE's beneficiaries as specified in Ex. A. FREEDOM LIFE has

unjustly benefitted by not paying fully NORTHWESTERN for the reasonable value of such services.

### *Benefits Provided to and Unjustly Retained By FREEDOM LIFE*

61.     FREEDOM LIFE further unjustly and directly benefited when it caused NORTHWESTERN to treat its beneficiaries, Patients, in the following ways:

62.     **Improved Health Outcomes** – FREEDOM LIFE has a vested interest in keeping their enrollees, like Patient, healthy, as healthier individuals require less medical care and incur fewer costs. By encouraging their enrollees, like Patient, to seek medical care when needed, including hospitalization, when necessary.  Further, prompt care helps patients return to work sooner, keeping them as a premium-paying policyholder and made claims more predictable.  The treatment provided prevented relatively small medical events from becoming "catastrophic claims" that hit FREEDOM LIFE's stop-loss or reinsurance layers.

63.     **Better Customer Satisfaction** – when patients received quality care at NORTHWESTERN, patients were more satisfied with their health insurance coverage which led to increased loyalty and retention rates for FREEDOM LIFE.

64.     **Increased Market Share** – by offering competitive coverage that includes access to high-quality hospitals, like NORTHWESTERN, FREEDOM LIFE was able to attract new customers and retain existing ones. This helped them gain a larger share of the market which led to increased profits and better bargaining power with healthcare providers.  In marketing, FREEDOM LIFE was able to promote that they provide robust emergency coverage—making their plans more attractive to employers and individuals.

65.     **Cost Savings** – FREEDOM LIFE saves money by avoiding further future costly treatments and is therefore able to keep premiums lower for their customers, further increasing

FREEDOM LIFE's attractiveness and competitiveness in expanding its patient-pool.

66. **Cost Control via Contracted/ or Usual and Customary Rates** – When NORTHWESTERN was in-network or had a single case rate agreement, FREEDOM LIFE paid the negotiated rate, which was typically lower than NORTHWESTERN's billed charges. Even when NORTHWESTERN was out of network, FREEDOM LIFE still had leverage to pay "usual and customary" or statutory rates rather than full charges (e.g., state balance-billing laws, Medicare-based payment caps in certain contexts).

67. **Cost Avoidance from Downstream Care** - Early ER intervention prevented costlier care later, e.g., preventing ICU admission, severe complications, or prolonged disability.

68. **Reduced Need for Post-Emergency Litigation or Liability** – NORTHWESTERN's prompt treatment lowered the chance that Patient (or their attorneys) could claim FREEDOM LIFE delayed or denied urgent care, which could have lead to costly lawsuits or bad-faith claims against FREEDOM LIFE.

69. **Regulatory & Legal Compliance Benefits** – FREEDOM LIFE was under implied obligations under EMTALA and direct obligations under the Prudent Layperson Standard (federal and Nevada state laws) that required FREEDOM LIFE to provide coverage for conditions a reasonable person would think need immediate attention.

70. **Avoidance of Regulatory Penalties** – Inducing NORTHWESTERN to provide care to Patient that met legal standards helped FREEDOM LIFE avoid fines or corrective action from state insurance departments.

71. **Defense Against "Bad Faith" Accusations** – had a Patient suffered harm due to denial or delay of medical services, FREEDOM LIFE could risk major reputational and legal damage. FREEDOM LIFE's inducement of NORTHWESTERN to provide care to Patients

**37287 - NMHC v FREEDOM LIFE**       14       **COMPLAINT AT LAW**

preemptively limited that exposure.

72. **<u>Claims Management & Cost-Sharing Leverage</u>** – After Patient's were discharged, FREEDOM LIFE was able to channel Patients into in-network follow-up care, keeping future costs down.

*Claims At Issue*

73. Despite NORTHWESTERNs' proper submission of claims for reimbursement, FREEDOM LIFE has failed to properly pay NORTHWESTERN for medical services supplies and/or equipment rendered to the Patients.

74. Prior to admission and/or following stabilization in NORTHWESTERNs' emergency department, NORTHWESTERN contacted FREEDOM LIFE and/or its agents to ascertain whether or not FREEDOM LIFE was responsible for the costs associated with the medically necessary services, supplies and/or equipment rendered to patients. In response, FREEDOM LIFE Plan's agent verified to NORTHWESTERN the relevant insurance verification and insurance coverage eligibility information for Patient under FREEDOM LIFE's health plan and per its insurance cards indicated that authorization was not required or provided an authorization number.

75. At all relevant times, FREEDOM LIFE's Plan held itself out to be the responsible payor for the services provided to patients. FREEDOM LIFE gave authorization reference numbers or indicated no authorization was needed and approved the medically necessary services rendered to Patients. In fact, FREEDOM LIFE paid a portion of the billing for all claims being made in this Complaint. FREEDOM LIFE was aware and knew that they are responsible for paying for each of their insureds.

76. Rather than properly and fully pay NORTHWESTERN for the medically necessary

services, supplies, and/or equipment NORTHWESTERN rendered to the Patients, FREEDOM LIFE underpaid, issuing payments of $41,605.10. To date, FREEDOM LIFE owes NORTHWESTERN no less than $589,182.00. Ex. A.

77. From December 13, 2021 through January 22, 2022, Patient received an emergency inpatient admission from home with a total length of stay of 40 days, and the insurer confirmed network participation and that no precertification was required for the inpatient admission.

**78.** During this admission, the hospital billed split claims for the inpatient stay spanning 12/13/2021–12/31/2021, 1/1/2022–1/12/2022, and 1/13/2022–1/22/2022, but the payer applied limited plan pricing and processed some lines "within contractual agreement," leading to substantial underpayments; for example, claims totaling $231,664.50 and $221,076.67 paid $12,600.00 and $25,200.00 respectively, leaving a large unpaid balance and prompting multiple escalations.

### *Private Healthcare Systems and Repricing*

79. FREEDOM LIFE utilizes access to the Private Health Systems ("PHCS") (a MultiPlan network) preferred provider organization to obtain discounted rates from participating providers for covered services rendered to its members.

80. The Parties' prior conduct, and the conduct at issue, honors agreed network repricing and proper PHCS discounts. However, FREEDOME LIFE failed to pay the discounted rate fully, resulting in material underpayment.

81. In practice, PHCS functions as the PPO network through which providers agree to furnish a broad range of healthcare services at negotiated, discounted rates, while payers like FREEDOM LIFE adjudicate claims using those network repricing terms when members receive care from participating providers.

82.     Here, FREEDOM LIFE confirmed network participation status and indicated that no precertification was required for the inpatient admission at issue, and that claims should have been repriced under PHCS through the member's term date.

83.     Against that backdrop, the operational relationship is that PHCS supplies pricing and repricing communications, while FREEDOM LIFE is responsible for applying those PHCS rates in claim adjudication and payment.

84.     FREEDOM LIFE processed certain lines within that agreement, but still underpaid high-dollar portions notwithstanding PHCS repricing assurances, prompting reconsiderations and escalations with both FREEDOM LIFE and PHCS/MultiPlan throughout 2022–2024.

85.     NORTHWESTEREN repeatedly engaged with PHCS/MultiPlan and FREEDOM LIFE to correct pricing and obtain proper authorization of network discounts, including MultiPlan's written confirmations on August 25 and August 30, 2022 that the 12/13/2021–1/12/2022 portion would be reprocessed with the correct PHCS discount of $158,619.81 and that claims through the member's term date of 1/22/2022 would be repriced under PHCS.

86.     Despite these assurances, the payer persisted in underpaying a high-dollar claim with one tranche totaling charges of $431,748.75 was underpaid by $270,900.40, and later represented that updated EOBs would be issued but failed to deliver them, necessitating escalation to this Court.

87.     Throughout 2022–2024, the hospital's revenue cycle personnel documented numerous calls and emails with FREEDOM LIFE and PHCS/MultiPlan, including references to claim numbers, reconsiderations on or about September 1, 2022.

88.     In sum, the claim centers on the FREEDOM LIFE's failure to honor agreed network repricing and proper PHCS discounts, resulting in material underpayment, disputed "in-network"

**37287 - NMHC v FREEDOM LIFE**                    17                    <u>**COMPLAINT AT LAW**</u>

contractual adjudication.

## COUNT I – BREACH OF IMPLIED-IN-FACT CONTRACT
(Against Defendant FREEDOM LIFE and DOES 1 through 25, inclusive)

89.     NORTHWESTERN incorporates by reference and re-alleges paragraphs 1-88 of this Complaint here as though set forth in full.

90.     By conduct alone and with no express agreement between them — an implied-in-fact contract arose between NORTHWESTERN and FREEDOM LIFE when Patient presented to NORTHWESTERN their insurance card and/or otherwise identified themself as being a member/beneficiary of a health plan financed, sponsored, and/or administered by a member company of FREEDOM LIFE.

91.     When Patient sought medical treatment at NORTHWESTERN and so identified themself, an implied-in-fact contract arose in which NORTHWESTERN agreed to render to that Patient all medically necessary services, supplies, and/or equipment needed by that individual and secondarily agreed to accept as payment, in full, monies received from FREEDOM LIFE that were in conformance to the discounted rates available to them by being affiliated with PHCS/MultiPlan (a non-party to this litigation). In return, FREEDOM LIFE agreed to pay for such care, albeit at the appropriate discounted rate regarding such care.

92.     NORTHWESTERN's usual and customary charges for rendering the medically necessary services, supplies, and/or equipment to the Patients set forth in Exhibit A, amounted to $788,225.25. At the discounted rates available to PHCS/MultiPlan affiliated companies, FREEDOM LIFE should have paid an aggregate amount of $630,787.10. However, FREEDOM LIFE only paid $41,605.10, leaving a deficit of $589,182.00 which amounted to a breach of its implied-in-fact contract with NORTHWESTERN.

93.    No express written contract between FREEDOM LIFE and NORTHWESTERN existed to prescribe payment for the medically necessary services, supplies, and/or equipment rendered to Patient and NORTHWESTERN did not perform those services gratuitously. Rather, FREEDOM LIFE knew and understood that NORTHWESTERN rendered such treatment with the expectation of being paid the discounted rate.

94.    Prior to the treatment rendered by NORTHWESTERN, through industry custom and practice, FREEDOM LIFE impliedly agreed, promissorily impliedly expressed and understood that NORTHWESTERN would render medically necessary care to FREEDOM LIFE beneficiaries, submit bills for such care to FREEDOM LIFE, and that FREEDOM LIFE would pay the discounted rates to NORTHWESTERN for the necessary medical treatment rendered to Patient, rather than Patient themself (except for co-payments, deductibles, and co-insurance amounts, in any).

95.    Specifically, prior to the dates that NORTHWESTERN admitted Patient to its facilities for medical services, NORTHWESTERN contacted FREEDOM LIFE to verify Patient's healthcare eligibility under a FREEDOM LIFE health plan, to obtain authorization from FREEDOM LIFE for the medical services rendered and to be rendered, and to establish its right to be paid by FREEDOM LIFE the discounted rates for such care. In response, FREEDOM LIFE represented that Patients was a beneficiary of one of FREEDOM LIFE's health plans, provided the authorization numbers incorporated in Ex A, and approved admission and treatment of the Patient.

96.    At no time did FREEDOM LIFE represent that it would not pay the discounted rates under the Contract to NORTHWESTERN for the necessary medical treatment rendered to Patient.

97.     Through NORTHWESTERN's treating the Patient, NORTHWESTERN's initiating contact with FREEDOM LIFE as described above, and FREEDOM LIFE's instructing the Patients to present their FREEDOM LIFE-issued identification to NORTHWESTERN, Plaintiff and Defendant entered into an implied-in-fact contract.

98.     The implied-in-fact contract was also formed through industry custom and practice, as well as Plaintiff and Defendant's prior and on-going course of conduct as described herein *supra* ¶¶ *30-82*. Prior course of conduct included, among other things:

a)  FREEDOM LIFE's issuance of identification cards to Patient;

b)  FREEDOM LIFE's instructing Patient to present such identification cards to medical providers so as to give assurances to those medical providers that such care would be paid for;

c)  NORTHWESTERN communicating with FREEDOM LIFE to ask for authorizations to render medical care to Patient and FREEDOM LIFE issuing authorizations to NORTHWESTERN for such care;

d)  FREEDOM LIFE communicating to NORTHWESTERN the medical eligibility benefits for Patient without advising NORTHWESTERN that FREEDOM LIFE would not make full payment of the discounted rates under the Contract for the services to be provided to Patients;

e)  FREEDOM LIFE sending written approvals to NORTHWESTERN for the specified medical services for Patient;

f)  FREEDOM LIFE requesting that NORTHWESTERN send FREEDOM LIFE clinical information and medical records.

99.    In addition, prior course of conduct by FREEDOM LIFE included NORTHWESTERN submitting claims to FREEDOM LIFE and in response, FREEDOM LIFE would properly pay the discounted rates under the Contract for those claims. Over the last five (5) years, NORTHWESTERN has billed numerous claims and FREEDOM LIFE has satisfactorily paid on a number of claims submitted by NORTHWESTERN in the near identical manner and method as the facts alleged herein.

100.    FREEDOM LIFE directly and deliberately benefited from those services by prompting, through its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, that NORTHWESTERN perform those services on Patient, thus fulfilling FREEDOM LIFE's obligation to secure medically necessary healthcare for its beneficiary. When Patient received those services, the express insurance coverage agreement made between FREEDOM LIFE and Patient was satisfied and FREEDOM LIFE was able to retain rightfully the premiums paid on behalf of Patient for enabling Patient to receive the medical care performed by NORTHWESTERN.

101.    Further, NORTHWESTERN directly conferred a benefit upon FREEDOM LIFE when it helped FREEDOM LIFE make good on promises FREEDOM LIFE made to its own members/beneficiaries that it would arrange for them to receive timely medical care, when necessary, at a first-rate medical facility.

102.    NORTHWESTERN provided medically necessary care to FREEDOM LIFE beneficiary as described above.

103.    NORTHWESTERN properly billed FREEDOM LIFE for the medically necessary services provided to Patient as listed in Ex. A.

104. FREEDOM LIFE breached the implied-in-fact contract by paying only $41,605.10, resulting in an aggregate underpayment of $589,182.00, per the discounted rates under the Contract, for the medical services performed by NORTHWESTERN.

105. NORTHWESTERN performed all conditions required on its part to be performed in accordance with the terms and conditions of the implied-in-fact contract.

106. FREEDOM LIFE breached the implied-in-fact contract by underpaying NORTHWESTERN for the medically necessary services, supplies and/or equipment rendered or supplied to Patient.

107. As a direct and proximate result of FREEDOM LIFE's breach of the implied-in-fact contract, NORTHWESTERN suffered damages in an amount to be proven at trial but not less than the sum of $589,182.00, exclusive of interest.

108. WHEREFORE, NORTHWESTERN prays this Court enter judgment in its favor and against FREEDOM LIFE as follows:

a) For the principal sum of $589,182.00;

b) For interest on such principal sum at the rate of nine percent (9%) per annum, pursuant to 215 ILCS 5/368(a)(c) and 815 ILCS 205/4, or in the alternative, for interest on such principal sum at the rate of five percent (5%) per annum, pursuant to 815 ILCS 205/2 and;

c) For such other and further relief as the Court deems just and proper.

**COUNT II – QUANTUM MERUIT (IN THE ALTERNATIVE)**
(Against Defendant FREEDOM LIFE and DOES 1 through 25, inclusive)

109. NORTHWESTERN incorporates by reference and re-alleges paragraphs 1-88 of this Complaint here as though set forth in full.

110. On the dates of service set forth in Ex. A, NORTHWESTERN provided emergency and/or medically necessary care to Patient.

111. In the alternative, assuming *arguendo* that it is determined that no express or implied-in-fact contract between FREEDOM LIFE and NORTHWESTERN existed, and/or that such a contract cannot be enforced as to the payment for the medically necessary services, supplies and/or equipment rendered to Patient, Plaintiff should nevertheless be fully paid under the common law doctrine of *quantum meruit*.

112. NORTHWESTERN did not perform these services gratuitously. Rather, FREEDOM LIFE, by its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, knew and understood that NORTHWESTERN rendered such treatment with the expectation of being paid.

113. Prior to the treatment rendered by NORTHWESTERN to Patients, through industry custom and practice, FREEDOM LIFE impliedly agreed and understood that NORTHWESTERN would render medically necessary services to FREEDOM LIFE beneficiaries, submit bills for such care to FREEDOM LIFE, and that FREEDOM LIFE would pay the usual and customary value to NORTHWESTERN for the necessary medical treatment rendered to Patient, rather than Patient themself (except for co-payments, deductibles, and co-insurance amounts, in any).

114. Specifically, prior to the dates that NORTHWESTERN admitted Patient to its facilities for medical services, NORTHWESTERN contacted FREEDOM LIFE to verify Patients' healthcare eligibility under a FREEDOM LIFE health plan, to obtain authorization from FREEDOM LIFE for the medical services rendered and to be rendered, and to establish its right to be paid by FREEDOM LIFE the usual and customary value for such care. In response,

FREEDOM LIFE represented that Patient was a beneficiary of one of FREEDOM LIFE's health plans, provided authorization numbers incorporated herein, and approved admission of Patient.

115. At no time did FREEDOM LIFE represent that it would not pay the usual and customary value to NORTHWESTERN for the necessary medical treatment rendered to Patient and at no time did NORTHWESTERN represent that it would perform the services gratuitously.

116. By treating Patient and initiating contact with FREEDOM LIFE as described above, NORTHWESTERN provided a benefit to FREEDOM LIFE and FREEDOM LIFE failed to compensate properly NORTHWESTERN for that received benefit, despite the prior and on-going course of conduct between NORTHWESTERN and FREEDOM LIFE. Prior course of conduct included, among other things:

a) FREEDOM LIFE's issuance of identification cards to Patient;

b) FREEDOM LIFE's instructing Patient to present such identification cards to medical providers so as to give assurances to those medical providers that such care would be paid for;

c) NORTHWESTERN communicating with FREEDOM LIFE to ask for authorization to render medical care to Patient and FREEDOM LIFE issuing authorization to NORTHWESTERN for treatment for that care;

d) FREEDOM LIFE communicating to NORTHWESTERN the medical eligibility benefits for Patient without advising NORTHWESTERN that FREEDOM LIFE would not make full payment of the usual and customary value of the services to be provided to Patients;

e) FREEDOM LIFE sending written approval to NORTHWESTERN for the specified medical services for Patient;

f) FREEDOM LIFE requesting that NORTHWESTERN send FREEDOM LIFE clinical information and medical records.

117. In addition, prior course of conduct by FREEDOM LIFE included NORTHWESTERN submitting claims to FREEDOM LIFE and in response, FREEDOM LIFE would properly pay the usual and customary value of those claims. Over the last five (5) years, NORTHWESTERN have billed numerous claims and FREEDOM LIFE has satisfactorily paid on a number of claims submitted by NORTHWESTERN in the near identical manner and method as the facts alleged herein.

118. In addition, FREEDOM LIFE pre-verified Patient's coverage and eligibility and authorized many of the treatments.

119. FREEDOM LIFE's authorizations for the treatments were implied requests to NORTHWESTERN to perform those services on behalf of Patient.

120. NORTHWESTERN rendered such treatments after the implied requests for such services by FREEDOM LIFE and NORTHWESTERN intended those services to benefit, among others, FREEDOM LIFE.

121. FREEDOM LIFE directly and deliberately benefited from those services by prompting, through its words and prior and ongoing conduct, and through the custom and practice in the healthcare industry, that NORTHWESTERN perform those services on Patient who was a beneficiary of FREEDOM LIFE, thus fulfilling FREEDOM LIFE's obligation to secure medically necessary healthcare for its beneficiaries. When Patient received those services, the express insurance coverage agreement made between FREEDOM LIFE and Patient was satisfied and FREEDOM LIFE was able to retain rightfully the premiums paid on behalf of Patient for enabling Patient to receive the medical care performed by NORTHWESTERN.

**37287 - NMHC v FREEDOM LIFE**       25       <u>**COMPLAINT AT LAW**</u>

122. Further, NORTHWESTERN directly conferred a benefit upon FREEDOM LIFE when it helped FREEDOM LIFE make good on promises FREEDOM LIFE made to its own members/beneficiaries that it would arrange for them to receive timely medical care, when necessary, at a first-rate medical facility.

123. NORTHWESTERN provided medically necessary care to the FREEDOM LIFE beneficiary as described above.

124. NORTHWESTERN properly billed FREEDOM LIFE for the medically necessary services provided to Patient as listed in Ex. A.

125. NORTHWESTERN is informed and believes and alleges thereon that FREEDOM LIFE expressly instructed its beneficiaries (including Patient) to seek medical care in an emergency from the nearest medical provider and for such beneficiaries to tell the emergency medical provider to send FREEDOM LIFE the bills for such care for payment by FREEDOM LIFE (except for co-payments, deductibles and co-insurance amounts, if any).

126. After NORTHWESTERN rendered the care specified in Ex. A to Patient, NORTHWESTERN properly and timely billed FREEDOM LIFE for such care.

127. The reasonable value of the medical care provided was and is the usual and customary charges of those services that is the total billed charges in the bills submitted to FREEDOM LIFE by NORTHWESTERN for $788,225.25. FREEDOM LIFE paid only $41,605.10, leaving a deficit of $746,620.15 owed to NORTHWESTERN.

128. Despite demands thereon, FREEDOM LIFE has refused to pay fully NORTHWESTERN for the medical care rendered to Patient as set forth in Exhibit A.

129. NORTHWESTERN did not perform these services gratuitously, but rather expected to be paid the reasonable and customary value for such services which amounts to $788,225.25.

**37287 - NMHC v FREEDOM LIFE**          26          **COMPLAINT AT LAW**

130.     FREEDOM LIFE unjustly benefitted by not paying fully NORTHWESTERN for the reasonable value of such services. FREEDOM LIFE promised its beneficiaries (including Patient) that it would pay medical providers who provided emergency and necessary medical treatment to those beneficiaries in exchange for Patient's premiums, collected such premiums and then refused despite demands to fully and properly pay NORTHWESTERN the reasonable and customary value of the medical care rendered to FREEDOM LIFE's beneficiaries as specified in Ex. A. FREEDOM LIFE accepted the services NORTHWESTERN provided to Patient as demonstrated by acts including but not exclusive to issuing authorizations and collection of premiums.

131.     As a direct and proximate result of FREEDOM LIFE's misconduct, NORTHWESTERN has suffered damages in an amount to be proven at trial but not less than the sum of $746,620.15, exclusive of interest.

132.     WHEREFORE, NORTHWESTERN prays this Court enter judgment in its favor and against FREEDOM LIFE as follows:

a)   For the principal sum of $746,620.15;

b)   For interest on such principal sum at the rate of nine percent (9%) per annum, pursuant to 215 ILCS 5/368(a)(c) and 815 ILCS 205/4, or in the alternative, for interest on such principal sum at the rate of five percent (5%) per annum, pursuant to 815 ILCS 205/2 and;

c)   For such other and further relief as the Court deems just and proper.

Dated:  May 7, 2026

Respectfully submitted,

LAW OFFICES OF STEPHENSON,
ACQUISTO & COLMAN, INC.

By:    /s/ *Lauren K. Miller*
One of the Attorneys for Plaintiff


Marcus R. Morrow, Esq., ARDC #6317812
Lauren K. Miller, Esq., ARDC #6342296
LAW OFFICES OF STEPHENSON, ACQUISTO & COLMAN, INC.
20 N. Clark St., Suite 3300
Chicago, IL 60602
Phone: (312)-626-1870
Fax: (818)-559-5484
mmorrow@sacfirm.com(cc: lbencomo@sacfirm.com)
lmiller@sacfirm.com (cc: sboyd@sacfirm.com)